May it please the Court, J. Allen Eisen for Defendant, Appellant, and Cross-Appellee Credit Data Services. The issue is a somewhat peculiar one. Could the district court say, on the one hand, these parties never made a contract because they never reached agreement on essential terms, but on the other hand say, nevertheless, I'm going to give plaintiff the benefit of that contract using promissory estoppel? Our contention is that the district court was plainly wrong in making that decision. There are really three primary questions here. The first is whether California or Florida law applies. We contend that the Florida statute of frauds applies. It does not recognize a promissory estoppel exception, and it applies simply because The issue was, in fact, raised in the district court. It was raised prior to the pretrial conference. The district judge ordered a special briefing on the issue, heard argument on it. Both sides had full opportunity to present their positions. The judge decided that he was not going to allow it. There's a suggestion that there was waiver of this issue. I'm not aware of how you waive it when you have raised it. I think the judge's But I'm not aware of any law that says that raising it at that point was too late. Consortium relies entirely on the Hurtado case, in which the California Supreme Court merely observed that the issue of foreign law is waived if raised untimely. But unfortunately, it didn't tell us what untimely means. The only cases we found and that Consortium Is it a question of California law, or is it a question of federal law? In this diversity case, this Court's held in diversity cases. It's a procedure, though. In Downing, the Court said, we will apply the California rule to determine which State's law applies, because it's a diversity case. That was the Downing ruling. On procedural rules? Yes. On the question of waiver, that's – I think the Federal rules would apply. I don't think so. I don't know of any Federal rule that says it's too late when you have given the other side sufficient warning prior to the pretrial conference that it's coming up, and particularly where the judge says, in the pretrial conference order, this issue's in play. I want to make sure I'm agreeing on it. Assuming for the sake of further discussion that there is no waiver, we then get into applying the three-part choice of law test. And the first one is, would Florida law reach a different substantive result from California law? The district court said yes. Do you agree? Yes. Tannenbaum is clear. Florida – and the Florida Supreme Court's reaffirmed that. The Florida courts will not read a promissory estoppel exception into the Florida statute. The legislature – the Court said at one point, I believe, in Tannenbaum, the restatement had been out there for 30 years, taking this position. And the Court noted that the legislature had plenty of opportunity to amend the statute if it meant to adopt that rule. It hadn't. And the courts weren't about to do it for them. The second test is, does Florida have an interest in enforcing its law in this case? The district court said no. Yes. I think the district court's analysis of that issue was wrong. First, we're dealing with a Florida corporation doing business in Florida. All of the face-to-face negotiations took place in Florida, in Orlando. All of the communications to the corporation were sent to Orlando. And the key communications on which plaintiff rests, the statements, don't worry, we have a deal, all of those were made by credit data's, CDS's, corporate officers in Florida. Where did the injury occur? That I'm not sure. Plaintiff was here in California when he learned that the deal was off. Was it a California corporation? Yes, it's a California corporation. And it went bankrupt? Pardon? It went bankrupt? I don't know. I don't think so, because they were still, well, I don't know what happened. The record stops in 2001. When they lost all their business? When, well, the record, he lost his business in September, the end of August, 99, when the contract with Abilene ran out. And then in May 2001, experience says, we're absolutely not doing business with you, and nobody who does business with us is doing business with you. And that's where the district court cut the damages. We don't know what happened after that. Let me ask you the third test. Is Florida's interest in enforcing its laws greater than California's in this case? I think so, and might I, just before I elaborate that, might I back one step to the second question? That is, what is Florida's interest? The district court's view was Florida's interest is to prevent the enforcement of unfounded claims based on faulty memories. This claim was unfounded. The district court said we never had a contract. That was plaintiff's first claim in this case, breach of oral contract. The district court said there isn't one, and there isn't one because, A, you didn't agree on all the material terms, and, B, relying primarily on Mr. Esquina's testimony, you never had the signed, written agreement that the parties always intended they would have before anything was binding. Well, I'm going to pursue that in relation to the Kojima case. But on that third, I'm interested in this choice of law issue. What's your response on the third question? In other words, is Florida's interest in enforcing its laws greater than California's in this case? Florida's interest is in protecting its citizens under its statute of frauds from what the Florida court considers to be liability based on faulty memory, perhaps perjured testimony, and to protect those who do business with Florida residents from the same danger. California's only interest is, perhaps, seeing this plaintiff compensated if he has a valid claim for promissory stock or a breach of contract. He hasn't either, in our view. California's interest is simply the fact that Mr. Esquina is here, so is the corporation. Florida's interest is in the transaction which is taking place, all the negotiations, everything is being done in Florida. Finally, on that, I do want to underline, we know from the record that there apparently was never any question that Florida law would apply, because the contract said that, at least the draft that was finally prepared, said Florida law will apply. Mr. Walsh, consortium's attorney, replies and says, well, there's some things we want to change. That wasn't one of them. So they were perfectly content with the Florida law. You can't push that argument too far in the light of your threshold argument. There's no contract. I understand that, Your Honor. I'm simply saying that that evidences the fact that there was never any doubt about that. All right. And Florida law does apply. I just want to finish this choice of words. If the Florida law does apply, that's the end of the case, then, I assume. That's correct. All right. That's correct. Well, pursuing this governmental interest line, the appellee suggests that there's another doctrine in Florida law that would allow recovery on an equitable theory, and that the Florida courts have upheld that in cases where a contract can't be, a written contract can't be proven up. If that's the case, then there is no conflict between Florida and California law, is there? There is still the conflict that the Florida Supreme Court says we will not, recognize a promissory estoppel exception to the statute of frauds. The couple of cases where the intermediate courts have recognized it are those cases where the district court, seized on this language, you'll recall, where the district courts, the courts of appeal, say, well, you're trying to use this statute as a sword, not a shield. You have complete performance. After the performance has been rendered, the consideration has been given, and the promissor now says, ha-ha, statute of frauds, the Florida courts have at least been willing to say at that point, no, now you're going too far, but we never have that happen here. We do not have that situation in this case, and the Florida Supreme Court is clear, we will not have promissory estoppel when it is simply a question of enforcement of an unexecuted oral promise. Well, now, let's look at the Kojima case. What's your analysis of the promissory estoppel issue as found by the trial judge here? Well, I think the way we analyze the case is the way this Court has analyzed the promissory estoppel issues in the three cases that we think are the most important here, Walker, Glenn-Hawley, and Oracle Corporation, all of which go back to Kojima and is one of the most recent cases, but they ultimately all go back to the original to the Youngman case and to Justice Traynor's decision in Drennan v. Star Paving. Those cases make it clear, in our view, that there never was a promissory estoppel case here for three reasons. One, we never had any detriment to the plaintiff from relying on this alleged promise. What we have is the plaintiff – if I could step back. The way I think it's easiest to think about the promissory estoppel theory is to ask a single question. What did my client do, if anything, that made the plaintiff's situation worse? And the answer to that is absolutely nothing. They said that they were going to enter into a contract, they certainly intended to, and they didn't. How did that worsen the plaintiff's situation? Even though it collapsed at the end, at the very end, just as the plaintiff was about to lose his contract with Abilene, and he had nowhere else to go, did that worsen his situation? No, because when plaintiffs started talking with our client, he had nowhere else to go. He never had another opportunity. This Court's analysis in Glen Folly, in Walker especially, going back to Youngman, the Court says you have promissory estoppel when plaintiff gives up some advantageous position, gives up some rights, gives up a contract that he or she might already have, does something to lose an advantageous position that they held before the promise was made. But Mr. Esquina comes into this situation, his contract with Abilene is ending, because Abilene's contract is ending with Experian. Experian absolutely does not want to do business with this man. He's been stealing business from them as they see it, stealing business from them, taking customers that they want to sell to. They want him out of their hair, and they tell Abilene, your contract's not renewed. He says he made dozens and dozens, those are his terms, dozens and dozens of calls trying to find someone else who would sell him Experian reports. He gets nothing. The only person, this record shows, the only person, the only entity that would even talk with him was CDS. The deal falls through at the last minute. How is his situation any worse than it was when he started talking with CDS? Well, the district court said that, made a finding of fact that CDS insisted that the consortium begin performance by sending membership applications and subscriber agreements to the dealers, the auto dealers, and telling the dealers that their services were being transferred to CDS and that, in fact, consortium did so. How do you respond? Do you think that was an error? Yes, I respond that that is exactly what this court was talking about in Walker. That those factual findings are clearly erroneous? Clearly erroneous. Well, the factual findings are true enough. Yes, that's what happened. Oh, okay. The judge's conclusion from that, that that gives rise to promissory estoppel, is what's wrong. In Walker, the court said very clearly, if the promisee's performance was requested at the time the promissor made the promise and that performance was bargained for, the doctrine is inapplicable. Why is that? Because the performance of the requested act is the consideration for which the parties are negotiating. If you have consideration, you do not have promissory estoppel. Well, that was – it was partial performance, wasn't it? And it wasn't – Your Honor, I don't think it makes any difference whether it's partial or complete. If it is the performance for which the parties have bargained, if it is the requested performance, that's consideration, and therefore no promissory estoppel. And the court went on in Walker to quote the California Supreme Court's explanation from Youngman and from Healy. The only reliance that can make the promissor's failure to perform actionable is the promisee's doing what was requested. That's exactly our situation. If that reliance was detrimental, then it would constitute consideration. If it was not detrimental, well, then there's no promissory estoppel because there's no detrimental anything. Do you agree with – It's that easy. I'm sorry. Do you agree with – yeah, it seems that the way you describe it – It seems a little cute, doesn't it? Yeah, it seems a little glib. I would agree with that. But do you – do you see the promise as the district court characterizes it? The district court said the promise was to prepare a draft and have a writing. Reduce the agreement to writing. Yeah. Yeah. They did say they would do that, and they didn't fulfill it. But again, where does that get you? If – first of all, if CDS was improperly dragging its feet and not reducing the agreement to writing, there is nothing in this record that indicates that Mr. Eskina could not have had his lawyer, Mr. Walsh, prepare a draft and send it to CDS and say, let's get going. Remember these negotiations, these talks start in January. In May, he meets with Ms. Rapp, who says, we've got a deal. We'll get it to you. Well, it's three, four months have gone by. When does anything happen next? The end of July. Does Mr. Eskina do anything in the meantime to get the contract prepared, to have a draft worked up, to send over a written proposal saying, this is what we want, here are the terms we want to do business on? No. I'm troubled by your assertion that Consortium had no other options. They did have other options, did they not? As a matter of fact, in reliance on CDS's promise, didn't Consortium stop looking for other credit agencies with which to do business? It did. And that was the situation in Oracle, in which this Court said – in Oracle plaintiffs says, I went to work for Oracle because they promised me these nifty, very lucrative stock options. We're talking about Oracle Corporation, one of the largest software manufacturers, I think second only to Microsoft now. They promised me these wonderful options if I went to work for them for a fixed period, and they breached by firing me before the end of the term. I am entitled to those options by promissory estoppel. Among other things, he says, I stopped looking for other work. And this Court said if that were enough, then the detrimental reliance provision, the detrimental reliance requirement of promissory estoppel would not exist. You must show that there was something else available. There is no evidence that Mr. Esquina ever had any other possible source. Actually, there was one, and that one he snubbed. He said, well, I don't want to do business with that company. I did business with them once before, and it was a pain doing business with them. I just don't want to deal with them. But there is no evidence that he had other opportunities that he gave up, that he passed up other contracts, that he gave up any existing contract. That simply does not exist on the face of this record. He came in with nowhere else to go. If CBS had never begun talking with him, if CBS had sat on the sidelines and said, sorry, we turned you down in 1995, and we're going to turn you down again, when he got to August 31st, he would have been in no different position. He would have gotten to August 31st with nowhere else to go. That would be it. CBS did talk with him, engaged him back and forth, backed out, and he ended up in exactly the same place. There is no change. There is no detriment. There is no reliance that can satisfy the requirements of promissory estoppel. With that, I'd like to reserve the last 230 seconds for rebuttal. You may do so. Thank you. May it please the Court. Good morning, Your Honor. Scott Davenport on behalf of the Consortium. With respect to the equitable estoppel issue in this case, which I think is a threshold issue on the choice of law of matter, there was an express finding by the district court that there was a failure to assert this in a timely manner. And this wasn't a ruling that came out of nowhere. The Florida statute of frauds was never asserted in the answer. The motion for summary judgment was not premised on Florida law. And this was not even raised until after the tentative came out, and the tentative was to deny the motion for summary judgment. This case had been litigated for over one year. And now, eight weeks before trial, suddenly this specter of a Florida statute is raised for the first time. And that is, you know, that's simply not timing, not timely. The California cases we did cite talk about the choice of law issue being raised for the first time in appeal. And they say that's too late. There was also a case, Summer v. Gaber, Summer v. Gabor, 40 Calat 4th, 1455, where it was raised for the first time in a reply to the motion for summary judgment. And the Court said that was too late. Here, it wasn't even in the reply. It wasn't until after the tentative came back, opposed to credit data services. This is clearly not timely. And also, laying over the top. I'm sorry, Your Honor. I want to ask you the same question I asked CDS's counsel. Which law do we apply to determine timeliness in waiver? Is that federal law? You know, I think that this is the case. There's always certain issues that are hard to tell whether they're federal or state. I think a good argument could be made that this is based on state law. But even if it weren't, I think that the California state law on this is really instructive. What we do know, based on federal law. I don't understand that response. I'm sorry. Is it federal law or state law? Or does it matter? I don't think it matters. In the California law, it talks about waiver. The federal law talks about the strong presumption that the foreign, the law of the foreign jurisdiction is going to be applied. And that was the Globespan case, which was cited in the cases it relied on. The strong presumption that it is or it isn't going to be applied. I'm sorry. I didn't understand what you just said. The Globespan case says that we must apply the law of the foreign state, quote, unless it's shown that there's a compelling reason to displace the foreign law. Therefore, California law applies as a matter of federal law. Is that what you're saying? Yeah. And also with respect to the choice of law issue, whether we're applying California versus Florida law. The assertion that they have. We're still stuck on timeliness. Right. What is the test to determine whether or not eight weeks before trial is timely in this case? It's our position that it's California law. But like I said, even if it is federal law, we think that the same outcome would be reached. Well, wasn't this set forth in the pretrial order? And doesn't that supersede the pleadings? Isn't that, therefore, clearly before the parties and the court from the beginning of the case? Well, I think what the pretrial order did is it didn't say that the Florida statute of frauds applied. It said it's either the California or the Florida statute. And at that point, it didn't make any sort of a firm determination on it. It was set forth alternatively, but it was raised. It was before the court. There was no lack of notice on the part of either party. Well, I think that there was a lack of notice for the entire over a year that the case had been litigated. It wasn't raised as an affirmative defense. There was no notice that this was a defense that was going to be asserted. And the discovery and the trial had been proceeding premised on the pleadings which framed the issues before the court. So I think coming in at the last minute in a pretrial conference statement, I think that that was something that was ultimately going to fail in either event. How did it come up? So I have the pretrial conference order in front of me, and they do state it in the alternative. How did it – was there a motion to determine that, or how did it come up? There were some other pleadings that went through. The court asked for a supplemental briefing on which would apply. Supplemental to what? I'm trying to remember now whether – I think it was prior – Pretrial order, or was there a motion? It was after the – it was after the summary judgment motion was denied. There was a supplemental – there was supplemental briefing on the choice of law issue, which law would apply. And that's when the court issued a banner that said that they were going to be equitably estopped from raising this issue. And in the alternative, the court went through this three-part governmental interest test and determined that even if they weren't estopped, that California law controlled. It's also important to note that, as I said, that there has to be a compelling reason to displace this forum law here in California. And there simply isn't in this case. In fact, the assertion that there is a compelling reason is belied by the fact that the defendant sat back for over a year and litigated this case and didn't raise it at all. If it were truly as important, as pivotal as they seem to imply in the briefing, it should have been raised right up front. Was there a change in counsel? There was a different trial counsel at hand in the case. There's – Mr. Eisen is new on appeal. Okay. Let's get to the merits here. Mr. Eisen argues that promissory estoppel does not apply because the – your client really had no other choice. You heard his argument. What's your response? He's wrong. Okay. But why? Because Monterey was ready, willing, and able to contract with him. We know that. Is that in evidence? Do you have that in the record? Yes. That's in the evidence. There's a factual finding by the trial court. I think it's at – I'll get the exact site. I want to say it's around excerpts of record 112 to 113. There was a factual finding that Monterey, when Esquinas went to mitigate his damages, Monterey was interested. They wanted to contract with him, and it was at that time that they determined that he'd been blacklisted. But Monterey was ready to go, and they wanted to work with Mr. Esquinas. And it's – I think it's really a – it's a nonstarter. The other thing you have to remember is he did discontinue his search for an alternate vendor. And this is not something that was done without his consent. I'm trying to suggest that is moot. There was nobody else out there. We know that Monterey was out there. And at the time, Mr. – at the time that all this was going down, Mr. Esquinas had not been blacklisted by Experian. That is something that happened as a result of him trying to mitigate his damages. So there were other – there is evidence that there were other vendors out there. Also, with respect to the promissory stop issue, I think it's important to note that what we have are some very extensive factual findings by the district court judge. And these are factual findings following a bench trial on an equitable cause of action. And I can't think of a more deferential standard at all. Well, what is it that triggers the promissory estoppel on the first instance? Maybe you should help us sort out what Kojima tells us about this case or about this kind of situation. Right. What the district court said is that credit data services promised to – there was an oral agreement in principle. And I say in principle because I don't want to – I don't want the court to believe this was some sort of loose negotiation or just preparatory work. This was more than that. Parties were taking steps to the final consummation of the deal. There was an agreement in principle. There was an agreement in structure. There was an agreement to price. There was a general agreement to the vast majority of the terms. And at the end of the day, a consortium was willing to concede to any of these outstanding issues just for the purposes of making this contract happen. That wasn't good enough for credit data services, which implies that these points were not the material sticking points in the contract. This contract did not fall apart because a question of whether it was $1.50 a report or $1.25 or whether the agreement was for two years or for four years. That's not why it fell apart. Now, credit data services came up with about four different reasons why it fell apart, and the district court expressly found that all of those were false. The district court said the reason this thing fell apart is because credit data services realized that they were going to get upside down in this deal, that for every report they sold to Mr. Squires for $1.50, they were going to lose a private sale for $2.50. And at that point, they realized that they weren't going to make any money on this deal, and they pulled out at the last minute, and they did so 14 days. But what is it under California promissory estoppel law that creates this obligation on the part of CDS? I mean, where did they cross the line in terms of triggering the right of your client to get promissory estoppel? I think it's when they continually demanded performance. Mr. Squires had not he had not just prepared to perform. He had performed. He had transitioned all his clients over. He merged his database. He sent all the subscriber agreements off to credit data services. There was a communication where he said, hey, make sure your fax machine is ready because 400 applications are coming in, and I've already notified all the dealers. It was done. This was a done deal. He had completely performed. And it was after all this was done, after the individual dealers were notified, and after everybody was completely transferred over, that they yanked the rug out at the last minute. Just so I understand the business here, so CDS now, after right at the moment when it decided not to finalize the contract, the written contract, what was the end result of that? Is it that all of consortium's customers were now direct customers of CDS? I mean, I don't understand what happened to the subscriber agreements and all of that. Right. The end result is that all of CDS's clients, all 425 auto dealers, were left without anyone to provide them credit reporting services. And in the auto industry, if you can't pull a credit report, you're not going to sell any cars. What Mr. Esquinas had to do, just so that he did not lose his professional reputation, is he transitioned those clients directly to Experian. So those clients are now pulling directly from Experian. You also have to realize that the credit... So just to follow up on that, so are credit data services and Experian, do they provide the same services? Credit data, Experian is the parent company. Okay. They sold to credit data services, who in turn generally sold to different vendors. What Mr. Esquinas did is he, depending on the size of the vendor, if you are a large corporate, if you're Nordstrom, and you pull hundreds of thousands of reports, you get a preferred rate. So they might buy them for $1.50. If you're Joe's Soup Shop and you don't pull that many, you might pull them for $2.50. What Mr. Esquinas did is he inserted another level in there. He saw this niche in the market and filled it. He assembled smaller dealers together into a larger pool and got a preferred price for them. And he would buy the reports for $1.50, and these numbers are just to make it easy. He'd buy them for $1.50. He'd sell them for $1.75. Okay. The individual vendors were happy because they were paying $1.75 as opposed to $2.50. Esquinas was happy because he was making 25 cents on every report. The problem happened, the problem was that for every report that credit data services sold for $1.50, they were now losing out on a back-end sale of $2.50 by selling directly to these people individually. I see. It really is a fascinating business that, for the most part, doesn't exist this way anymore. The credit reporting service has changed remarkably in the last five years, in large part because of cases like this, and also there's just a desire to have more information flowing to the consumer. I mean, I remember a time you couldn't get your FICA scores, and now it's a lot more open. It used to be everyone dealt through these regional affiliates. Counselor, I'd like to get to the damages issue, if you finish on that point. I'd love for you to get to the damages issue. Well, I've got a problem. I don't understand why Judge Carter allowed loss-of-profits damages rather than reliance damages. There's a significant difference, is there not? Well, I think that there's sort of a misnomer in how these were awarded. Credit data services talks about these as speculative expectation damages, and cites a bunch of cases about competitive bids that have gone awry. And, you know, I want to put in the Red Line rail transportation under Los Angeles, and I didn't get the chance to do that, and I lost $4 million in loss-of-profit. And the court said, no, no, those are expectation damages. You're not going to get these. What happened in this case is the consortium experienced significant out-of-pocket damages. Basically, a business was destroyed here. An ongoing thriving business was destroyed based on the conduct of credit data services. And, yeah, we are talking about loss-of-profits, but we're talking about loss-of-profits not in terms of speculative expectations, but more importantly, it's what is the value of this business that was run into the ground, this business that generated $50,000 of passive income a month. You know, most of it, our law practice, if we stop showing up, the money stops coming in. This was a passive business that continued to generate $50,000 net every single month, and it was going up as more and more of these individual resellers realized rather than paying $250,000, I can pay $175,000. The consortium business was growing exponentially. So this is not a situation where we're talking about, you know, hey, you know, I could have made $2 million. The world is filled with people with great dreams of what could have been. This is not that. This is an ongoing thriving enterprise that was driven into nothingness. There was a question about whether or not consortium is bankrupt. Well, they're not bankrupt. They had no liabilities. They just stopped having any income whatsoever. I wonder how that helps my concern about the difference between lost profits expectancy damages and reliance damages. Because even Kojima, as I understand it, says that expectation damages are disfavored in promissory estoppel cases. Yeah. And again, I would just come back to Your Honor. I don't think these can be fairly categorized as expectation damages. These are more direct out-of-pocket damages. But they're based on what? I mean, what was the fundamental assumption which the Court indulged in which would establish that? Well, I think what the Court did do with how do you value a business that generates this sort of income stream that has come to a halt as a result of conduct that took place on behalf of the defendant? So maybe your argument is that these really aren't expectancy damages at all. They are reliance damages. Is that the essence of your argument? Yes. I think that's a fair statement. What's your strongest case to support that? That is something that I believe in the briefing. And I'm coming blank on it right now. If you would like further authority on that, we can do a 28-J letter within five days, and I'd be happy to provide that. Well, you could just look at Witkin on California law. I mean, it's right there. Unless there are any further questions, I would like to reserve at least a few moments on the cross-appeal, on the value of what is this value of the business. Well, I don't think we heard argument on the cross-appeal, so that's moved at this point. Did we? No, we ran through our 20 minutes pretty quickly. May I have another moment or two just to talk about the value of the business? Very, very quickly. Okay. I mean that. 30 seconds. Understood. Let me go at it this way. What the court did is the court terminated all damages as of the point in time that Experian blacklisted Experian. Experian blacklisted consortium. It's our position that that was a error of law, because this was not a superseding event which broke any sort of chain of causation. The fact is, is that when you engage in conduct which sets forth a stream of damages, sets a stream of damages in motion, you can't duck out of your liability when another party is injured based on attempting to mitigate their damages. And that's what happened here. Had they not breached the contract, they never would have been placed on the ---- But the California law that you didn't cite says that in awarding damages under promissory estoppel, the court can fashion the remedy to the extent that justice requires. He obviously found that at that point justice required the flow of damages to stop. I think that that would be true if the judge would have said that. If he had said, look, I'm only going to give you this much damages because I don't want to give you the whole $18 million. But what the court did is it relied on an erroneous statement of law in terminating damages. If we were to remand this, it's possible that Judge Carter could say, you know what, maybe I shouldn't have cut it off. Let me take another look at this. Or he could say, no, I meant to give you 1.2 and that was it. We just don't know. Didn't he have the opportunity to do that when the other side filed its motion to amend the judgment? And he didn't do it, right? That's correct. Never mind. We're just going over time. Sorry. Okay. Thank you, Counselor. Mr. Eisen. Thank you, Your Honors. In answer to a question Judge Wardlaw asked, the issue came up in a statement of issues and contentions that CDS filed in December. December 16th, I think, was the date just before the start of trial. But it was also at the time getting ready for the pretrial conference. And at the pretrial conference, as we know, the judge said, this issue is in play. Let's hear about it. We believe that it was timely. We've cited to you several cases in very similar situations where the defendant tells the plaintiff in National Dollar Stores, go ahead in your plan to rehab the building and we'll lease it to you under a new lease. Plaintiff goes ahead and does it. And the court says there's no promissory estoppel there. You never really had an agreement. The restatement, Section 90, the example that the restatement gives sounds a lot like this case where the plaintiff is a baker at Defendant's instructions. He buys a grocery store. He later sells it and the bakery to generate capital for the franchise that Defendant said, I'm going to sell you at this price. Defendant then changes the price and the deal falls apart. The restatement says, well, you might have promissory estoppel, but all you can recover are the losses you suffered when you sold the two businesses. You can recover, but you can't recover the profits you would have made from the franchise. That's not allowed. What difference would that make in this case? The award was for what, 1.8? Assuming it is reliance only, what range would the damages fall into? Zero. There is no evidence whatsoever of any reliance damages that Mr. Skema suffered. We may presume that he had some phone bills for calling Florida. He had some fax charges for sending out the forms. He may have had some photocopying charges. And maybe on a good day, he could claim the reasonable value of his time in doing that. There is no evidence of any of it, however. He went for the full thing. And we have no evidence of any reliance damages in this case. Well, that seems inconsistent with the notion that some damages were allowable. I mean, you're still arguing absence of promissory estoppel. No, I'm arguing that there was never any proper showing of any damages that could be recovered in promissory estoppel. There's no promissory estoppel, but if there was, he didn't prove the kinds of damages he needed to prove. He didn't show that he actually lost anything or expended anything. What about the performance that we heard from Mr. Davenport, where all of these 400-plus applications were all delivered before CBS changed its mind? He performed, although CBS didn't get the benefit of that performance. But that again, that raises the problem that if he performed, if he rendered the requested performance, that is not promissory estoppel. That's the consideration. Number two, we don't know what the loss was to Mr. Esquinas, if anything, in rendering that performance. That's all he can get, his out-of-pocket losses, the advantage he gave up. We have no evidence of any of that. I'm about 52 seconds over, but I would like to mention one last thing with the Court's permission, and that is the Monterey issue, the only time Monterey comes into the picture, the only time, is in 2001. Prior to that, there's no evidence that anybody else would talk with Mr. Esquinas. There's only the evidence that we have that nobody else would, that this deal fell apart only because, that this deal fell apart, and that when it did, in the district court's opinion, the parties had not yet come to agreement on, quote, material essential terms that could be enforced as a contract, either for consideration or by promissory estoppel. We ask this Court to reverse. Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn. Thank you, Your Honor. All rise. The Court will concession stand adjourned.
judges: O'scannlain, Wardlaw. Lovell